**RAINBO BAKING COMPANY et al.,**
**Appellants,**

v.

**S & S TRUCKING COMPANY, etc.,**
**Appellee.**

Court of Appeals of Kentucky.

Oct. 30, 1970.

C. W. Swinford, John L. Davis, Stoll, Keenon & Park, Lexington, for appellants.

Lively & Rodes, Danville, Dean & Dean, Harrodsburg, for appellee.

PALMORE, Judge.

At about 1:45 A.M. on a clear night in October of 1967 a truck-trailer unit owned by Rainbo Baking Company and driven by its employe, Herbert Tye, collided with the rear end of a disabled truck-trailer unit owned by S & S Trucking Company and operated by its employe, Dewey Davis, under lease to Sharpe Motor Lines, Inc. In the ensuing litigation Davis and S & S obtained a verdict and judgment against Tye and Rainbo for personal injuries and property damages and the claims of Tye and Rainbo against Davis, S & S and Sharpe were dismissed. Tye and Rainbo appealed, and Tye having since died, the administratrix of his estate has been substituted as a party.

The appellants contend that Davis was negligent as a matter of law, for which reason a verdict should have been directed on the claims of Davis and S & S against Tye and Rainbo, and that the instruction relating to Davis' duties was erroneous. Both contentions center on the subject of setting out warning flares or signals when a truck becomes disabled on a highway.

The collision took place in the west or southbound portion of U.S. 127, a 4-lane divided highway, about a mile and a half north of Harrodsburg. Davis, carrying a load of furniture from North Carolina, had been traveling northward, but after passing through Harrodsburg he began to have engine trouble and turned back toward town in order to find a mechanic. As he proceeded southward his motor stalled and he was unable to start it again. He did the best he could to get the truck-trailer unit onto the shoulder, but when it came to rest it extended about six feet onto the main traveled portion of the southbound highway, which at this point was 23 feet wide with a broken white line marking the center. According to Davis, all of his lights, including headlights, clearance lights, and 4-way blinkers, were burning. Eight of the clearance lights were located on the rear end of the trailer and were visible to traffic coming from that direction.

At a distance of .6 miles north of the point where Davis stopped the highway tops the crest of a small hill. Between these two points it is straight and there is nothing to obstruct the view of a driver approaching from the north.

At about the time Davis got out of his truck another truck moving in the same direction stopped alongside and its driver offered help, but Davis asked him to go on into town and send a wrecker or a mechanic. This driver then gave Davis two fusee-type flares and went on. Davis had several more of the same type flares on hand, and he proceeded at once to place and ignite three of them along the highway to the rear at distances of 30 feet, 100 feet and 600 feet north of his trailer.

After Davis had lighted the flares a southbound stake truck operated by a man named Patterson stopped in front of Davis' vehicle and Patterson offered help. According to Davis, Patterson also left his clearance lights and 4-way blinkers burning. Patterson professed to have had some experience with truck engines, so he and Davis jacked up the cab of Davis' truck in order to inspect under the hood. Patterson then suggested tightening the cable connecting the starter with the battery, and returned to his own truck for a screwdriver. While Patterson was on this mission the Rainbo truck collided with the rear end of Davis' unit and knocked it a distance of 44 feet. Meanwhile, Davis says, several other southbound vehicles had passed by without incident. Both Davis and Patterson were hit by the Davis truck as it was propelled forward by the force of the impact.

Patterson did not testify. Davis could not say whether the flares were still burning as of the moment of the collision, because from his position in front of his tractor-trailer he could not see the highway behind it and to the north. He estimated, however, that at the time of the accident his unit had been stopped for 15 to 20 minutes and that the kind of fusees he had put out ordinarily burn for 15 to 20 minutes.

The first or second southbound vehicle approaching after the collision was a Killion truck. Its driver did not testify, but his affidavit was read in behalf of Tye and Rainbo. He did not notice any lights or signals and was unaware of the wreck ahead until his headlights disclosed the presence of the vehicles involved in it. He applied his brakes, cut to the left and stopped in the inner southbound lane of the highway just beyond the Patterson truck.

The other southbound vehicle that appeared on the scene very closely after the accident was a truck driven by James Douglas Arthur, who testified for Davis and S & S. Whether Arthur's truck or the Killion vehicle was the first to arrive is not clear, but anyway, Arthur said that as he topped the crest of the hill he saw "a red light burning and it burned for just a second or so and went right out, and it attracted my attention." We continue with pertinent quotations from his testimony as follows:

Q. "Where was this?"

A. "North of where the wreck was, as I topped the little rise there."

Q. "Do you know what that red light was?"

A. "No, sir, I don't know. It appeared to be a flare, but I wouldn't swear one way or the other whether it was or not."

Q. "You have been driving trucks for seven, eight or nine years?"

A. "Yes, sir."

Q. "You have seen many truck flares on the highway in that time, haven't you?"

A. "Yes, sir, I have."

Q. "What did you do after you had seen the flare and then your headlights, a quarter of a mile away, picked up the trucks—what did you then do?"

A. "I was running on low beam—but back before I even got to the rise—there is something I didn't say—I had met a car or truck one—I don't remember which it was—but it flashed its lights like there might be a state policeman ahead with radar, like they do sometimes, or a wreck ahead or something, so I flipped my lights on bright and didn't see anything, and then I topped this little rise and I noticed this red light and I flipped them on bright when it went out and I could see a faint something up there, and I flipped my road lights on and that brightened things up almost like daylight, and I could see the wreckage up there. I flipped my clearance lights at the traffic behind me and turned on my 4-way flashers, and seen a guy running across there with a light in his hand from out in the middle of the grass there."

Q. "Who was that—did you find out?"

A. "It was the man driving the S & S truck."

\* \* \* \* \* \*

(On cross-examination:)

Q. "And then as you went over the rise, I believe you said you saw a red light of some variety and then it went out the minute you saw it—in fact, I believe you said in your statement that that was what made you notice it, because you saw it—first, it was there and then it wasn't there?"

A. "And then it wasn't."

\* \* \* \* \* \*

Q. "Did you see any flares out when you got out of your truck?"

A. "I didn't look for any."

Q. "If they had been there, you could have seen them, couldn't you?"

A. "Like I said, that one that appeared to be a flare to me burned out before I got there."

Q. "And I believe you said you didn't know for sure whether that was a flare or a red light."

A. "Yes, sir, it went off."

Herbert Tye, driver of the Rainbo outfit, testified that he saw "no lights, no flares, no nothing" and was completely unaware of the S & S unit until he was "right on it," which he guessed as within 50 to 75 feet, despite the fact that his own headlights were in good order and enabled him to see 350 feet ahead. Upon seeing the S & S trailer he cut his wheels to the left, but too little and too late to avoid the collision. There was no traffic approaching from the other direction to blind him or distract his view, and the left southbound lane was clear. There was no other vehicle proceeding immediately ahead of him and no physical obstruction to the view between his vehicle and the S & S unit as he came over the crest of the hill and approached from a distance of .6 miles.

The argument for Tye and Rainbo is that Davis was under the absolute duty of having warning flares or lights burning at the proper points on the highway at the time the Rainbo truck approached, that the evidence is insufficient to support a finding that he did so, and that his failure in this respect was negligence per se and a proximate cause of the accident as a matter of law.

KRS 189.570(2) provides in substance that when a motor truck or its lighting equipment [1] is disabled on the main traveled portion of a highway at night the operator shall place such signals on the highway as may be prescribed by the regulations of the Department of Motor Transportation (DMT). DMT Regulation No. 15–16 in turn adopts by reference Sections 192.20 through 192.33 of the Revised Safety Regulations of the Interstate Commerce Commission as amended February 1, 1967. Upon succeeding to the jurisdiction of the I.C.C. in this field the Federal Highway Administration adopted the same rules, and

---

1. As construed in Duncan v. Wiseman Baking Company, Ky., 357 S.W.2d 694, 698 (1962).

what was formerly I.C.C. Regulation No. 192.22 is now Federal Highway Administration Regulation No. 392.22, the pertinent portions of which read as follows:

"(a) TURN SIGNALS. Whenever any motor vehicle is disabled upon the traveled portion of any highway or the shoulder thereof, during the period lighted lamps are required, except where there is sufficient all-night street or highway lighting provided as such to make it clearly discernible to persons on the highway at a distance of 500 feet, the driver of such vehicle shall immediately, upon learning of the disability, flash the two front and two rear turn signals simultaneously as a vehicular traffic hazard warning and continue such flashing until he shall have placed the portable emergency signals required by paragraphs (b) to (e) of this section in use on the highway, and during the time such portable emergency signals are being picked up for storage prior to movement of the vehicle. These warning signals may be given at other times during vehicle disablement in addition to but not in lieu of the portable emergency signals required in paragraphs (b) to (e) of this section.

"(b) FUSEE, LANTERN, OR REFLECTOR. The driver of such vehicle shall immediately place on the traveled portion of the highway at the traffic side of the disabled vehicle, a lighted fusee, a lighted red lantern, or a red emergency reflector.

"(c) FLARES, LANTERNS, OR REFLECTORS. Except as provided in paragraphs (d), (e), and (f) of this section, as soon thereafter as possible, but in any event within the burning period of the fusee, the driver shall place three liquid-burning flares (pot torches), or three red electric lanterns, or three red emergency reflectors on the traveled portion of the highway in the following order:

"(1) One at a distance of approximately 100 feet from the disabled vehicle in the center of the traffic lane occupied by such vehicle and toward traffic approaching in that lane:

"(2) One at a distance of approximately 100 feet in the opposite direction from the disabled vehicle in the center of the traffic lane occupied by such vehicle; and

"(3) One at the traffic side of the disabled vehicle, not less than 10 feet to the front or rear thereof. If a red electric lantern or red emergency reflector has been placed on the trafic side of the vehicle in accordance with paragraph (b) of this section, it may be used for this purpose.

\*     \*     \*     \*     \*     \*

"(e) DIVIDED OR ONE-WAY ROADS. If the disablement of any motor vehicle occurs upon any roadway of a divided or one-way highway, the driver shall place one warning signal at a distance of 200 feet and one such signal at a distance of 100 feet to the rear of the vehicle in the center of the lane occupied by the stopped vehicle; one such signal at the traffic side of the vehicle not less than 10 feet to the rear of the vehicle."

These regulations were not introduced into the record, and the briefs do not discuss whether they are a proper subject of judicial notice. We shall assume, but without deciding, that they were and are, observing meanwhile that the adoption of administrative regulations by reference to the regulations of other agencies is at best a sloppy practice. In any event, despite the contention of Tye and Rainbo that the only question in the case is whether Davis was required to comply, we find that proposition immaterial to a disposition of the appeals.

In their discussions with the trial court incident to the motion for a directed verdict and to the giving of instructions Tye and Rainbo gave particular stress to the

proper placement of the warning devices, whereas on this appeal the emphasis has been shifted to the question of replacing or keeping them in operation. Considering the uncontradicted evidence that fusees were placed on the margin of the pavement at distances of 30, 100 and 600 feet north of the S & S unit, together with Tye's testimony that he did not see any lights or signals at all, that is of course the vital point in the case—not where, but whether. If the fusees were at the places shown by the evidence and were still burning when Tye arrived, that they were not arranged precisely in accordance with Regulation No. 392.22 as quoted above would not have been a vital causative factor.

■ With respect to the motions for a directed verdict Tye and Rainbo argue that there was no substantial evidence to support an inference by the jury that the fusees were still burning when Tye approached the scene of the accident. [It is admitted, of course, that Davis did not set out any of the longer-burning pot torches, lanterns or reflectors mentioned in subparagraph (c) of the regulation.] Conceding this point arguendo, the burden of proving Davis' negligence was on Rainbo and Tye. Hence in order to secure a peremptory on that issue it was up to them to prove conclusively that the lights were *not* burning. Davis having testified that the fusees would burn 15 to 20 minutes and that the accident took place within 15 to 20 minutes, the jury very well could have failed to reach a conclusion as to whether the flares were still burning, in which event the parties with the burden of proof had to lose. Since the jurors were not required to believe Tye's account of the accident, we are of the opinion that the actions of the trial court in overruling Tye's and Rainbo's motions for a directed verdict were correct.

■ The instruction (No. 2) given by the trial court on Davis' duties was as follows:

"It was the duty of Dewey Davis, the driver of the S & S Trucking Company truck, at the time and place referred to in the evidence, not to stop his truck on the main traveled portion of the highway or leave it standing unless the said truck had become disabled in such a manner and to such an extent that it was impracticable to move it while awaiting repairs or sufficient help obtained for its removal, in which latter event he had the right to park said truck on the main traveled portion of the highway. It was the further duty of the driver of the S & S Trucking Company truck, within a reasonable time after his truck became disabled, to cause flares, lanterns or other signals to be lighted and placed upon the highway, with at least one flare to be placed in the immediate vicinity and near to the stalled truck and at least one other flare to be placed at a distance of not less than one hundred (100) feet to the rear of the stalled truck to warn approaching vehicles of the presence of his truck. If you believe from the evidence that he failed to perform one or more of these duties and such failure, if any, was the proximate cause of the collision referred to in the evidence, then the law is for the defendants Rainbo Baking and Herbert G. Tye."

Tye and Rainbo made timely objection to this instruction as follows:

"The defendant further objects to the language of said Instruction 2 in which the Court instructs the jury that at least one flare was to be placed in the 'immediate vicinity of the truck.' The Federal regulations clearly provide that when a truck becomes disabled that a flare should be placed at least 100 feet in front of said truck and another flare should be placed at least 100 feet to the rear of said truck and that a third flare should be placed on the traffic side of the disabled vehicle, not less than ten feet to the front or rear thereof. De-

fendant states the instructions should have incorporated the language of the Federal Highway Administration of the United States Department of Motor Transportation Directive 15–06 [sic], which is provided for by the Kentucky Revised Statutes 189.070(2)."

In addition, Tye and Rainbo offered the following instruction, which the court refused to give:

"The Court instructs the jury that it was the duty of Dewey Davis, driver of the S & S Trucking Company truck, at the time and on the occasion mentioned in the evidence to exercise ordinary care for his safety and for the safety of others then and there using the highway which duty included the following duties:

"(1) Not to stop his vehicle upon the main travel [sic] portion of the highway.

"(2) If his truck became disabled and could not be removed from the main travel [sic] portion of the highway, then it was the duty of Dewey Davis to cause flares, lanterns or other signals to be lighted and placed upon the highway one (1) at a distance of approximately one hundred (100) feet in advance of the disabled vehicle, one (1) at a distance of approximately one hundred (100) feet to the rear of the vehicle and a third to be placed upon the roadway side of the vehicle.

"Now if the jury believes from the evidence that Dewey Davis, driver of the truck belonging to S & S Trucking Company, violated any one or more of the duties imposed upon him by this Instruction and that such violation, if any, was the proximate cause of the collision referred to in the evidence, then the law is for the defendant, Rainbo Baking Company and for Herbert G. Tye and you will so find unless you find for Rainbo Baking Company and Herbert G. Tye under other Instructions given to you by this Court."

Had Tye and Rainbo insisted upon an instruction incorporating the provision of subparagraph (c) of the regulation requiring the driver to set out further warning devices within the burning period of the fusees, or had they specified the omission of that requirement when they objected to the instruction that was given, their appeal would be better premised. However, it is demonstrably clear from the above quoted language of this objection and of the tendered instruction that they did not have this requirement in mind and did not bring it to the attention of the trial court. To the contrary, the entire focus of the discussion and tendered instruction was directed to the question of where the warning devices should have been placed along the highway, and in this particular respect it will be observed that the trial court was asked to instruct under subparagraph (c) instead of subparagraph (e), which specifically covers divided highways and was the applicable regulation relating to location of the devices.

Assuming that the federal regulation was applicable, since Davis did nothing other than placing temporary fusees the issue of his negligence could have been covered by an instruction submitting the simple question of whether the fusees were still burning when Tye approached close enough to be able to observe them. If not, Davis failed to perform what was required of him by subsection (c) of the regulation by not setting out, within the burning period of the fusees, longer-lasting signal devices of the kind therein specified. No such instruction was requested.

It is our conclusion under CR 51 that Tye and Rainbo did not adequately specify to the trial court the theory on which they now rely in this court.

The judgment is affirmed.

All concur.